IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
MICHAEL GILDENSTERN,            )
                                )
                Plaintiff,      )
                                )
    v.                          )   No.  08 C 6857
                                )
ABBOTT LABORATORIES,            )
                                )
                Defendant.      )
```

<u>MEMORANDUM OPINION AND ORDER</u>

Michael Gildenstern ("Gildenstern") has brought a four-count Complaint against his former employer Abbott Laboratories ("Abbott"), charging that Abbott discriminated against him by imposing disparate discipline[1] because of his race (Caucasian) and national origin (United States of America) in violation of Title VII of the Civil Rights Act of 1991 ("Title VII," 42 U.S.C. §§2000e to 2000e-17) and 42 U.S.C. §1981 ("Section 1981"). Abbott has moved for summary judgment on all of Gildenstern's claims under Fed. R. Civ. P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Abbott's motion is granted.

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v.</u>

---

[1] Gildenstern's Third Amended Complaint also adverted to asserted retaliatory discharge and pay discrimination, but the parties' summary judgment submissions address only disparate discipline discrimination. This opinion follows the parties' lead, treating the now-unmentioned theories of recovery as abandoned.

Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**Factual Background**

What follows is a summary of the facts, viewed of course in the light most favorable to nonmovant Gildenstern.[2] Abbott is a health care company that maintains a campus in North Chicago, Illinois (A. St. ¶¶1-2). Between August 1990 and November 2008 Gildenstern worked at the carpenter shop on Abbott's North Chicago campus as a "senior trades person," doing building maintenance and construction work (A. St. ¶¶5-6; G. St. ¶6). From 2001 through his termination, Gildenstern also performed

---

[2] This District Court's LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Abbott's LR 56.1 statement as "A. St. ¶ --," to Gildenstern's LR 56.1 statement as "G. St. ¶ --" and to the parties' responses as "A. Resp. ¶ --" and "G. Resp. ¶ --." Where the opponent does not dispute a party's original statement, this opinion cites only that original statement.

2

"scheduler/planner" duties (which involved scheduling work orders), but he never received the position title "scheduler/planner" and Abbott never increased his base pay grade (A. St. ¶10; G. St. ¶¶10, 73). From 2005 until his termination Gildenstern's immediate supervisor was section manager Larry Heg ("Heg"), who in turn reported to Terry Ketterling ("Ketterling"), manager of Lake County maintenance (A. St. ¶¶15-16). Throughout Gildenstern's employment Abbott's relevant disciplinary policies were (1) a policy providing that dishonesty and theft are grounds for termination and (2) Principle 10 of its Code of Business Conduct, which states that Abbott employees "must safeguard Abbott's assets against loss, damage, carelessness, waste, misuse and theft" (A. St. ¶¶21-22, 25).

On August 25, 2008[3] Global Security (Abbott's investigative division) received a telephone call from Gildenstern's ex-wife Mary Nighbor ("Nighbor") about locks and keys possibly belonging to Abbott (A. St. ¶26, G. Resp. ¶26). On August 27 investigator William Munts ("Munts") spoke to Nighbor, who told him that several years earlier Gildenstern had installed a lockset at her house, had given her a padlock and had provided her with keys marked "Abbott Do Not Duplicate" (A. St. ¶29; G. Resp. ¶29).[4]

---

[3] All events occurred in 2008 unless otherwise indicated.

[4] Gildenstern objects that Nighbor's statement to Munts is inadmissible hearsay (G. Resp. ¶29). But Abbott offers Nighbor's statement not for the truth of the matter asserted, but rather to

3

Munts asked Nighbor to send him photographs of the lockset, padlock and keys (A. St. ¶30). Nighbor's photographs showed two keys stamped "Abbott Do Not Duplicate" (A. St. ¶¶31, 32), while the lockset and padlock were not labeled with Abbott's name (G. St. ¶85).

In October, as part of the investigation, senior investigator William Meadie ("Meadie"), manager of employee relations Lori Rakosnik and Munts met with Gildenstern (A. St. ¶33). Gildenstern recalls that he was told that he was accused of "being irresponsible" with an Abbott lock and that Meadie showed him Nighbor's photographs of the keys, lockset and padlock (A. St. ¶33; G. St. ¶76; A. Resp. ¶76). Gildenstern told Meadie that he could not tell if the keys were his, that he had not installed the locks at Nighbor's house, that the pictured locks were widely available and that other Abbott employees had Abbott locks at home (A. St. ¶35; G. St. ¶76; G. Resp. ¶¶34, 45). Gildenstern suggested instead that Nighbor had come forward with a story about the locks due to a grudge against him and that perhaps another locksmith of Nighbor's acquaintance had removed the locks from Abbott and installed the lockset at her home,

---

demonstrate how Abbott conducted its investigation and concluded that Gildenstern violated Abbott's Code. To prevail at the summary judgment stage, Abbott need not prove that Gildenstern actually engaged in theft or misuse of property. Abbott need show only that it honestly believed that he did so (see <u>Gordon v. United Airlines, Inc.</u>, 246 F.3d 878, 889 (7th Cir. 2001)).

emphasizing that Nighbor is acquainted with several locksmiths (G. St. ¶79).

Later, at Abbott's request, Waukegan Safe and Lock (the vendor that supplies locks to Abbott's North Chicago Campus) removed the lockset from Nighbor's house and provided Munts with the lockset and padlock (A. St. ¶¶28, 41, 42). Waukegan Safe and Lock informed Munts and Meadie that the cylinder in the lockset was keyed to the master key that opens buildings R5 and R6 at Abbott's North Chicago Campus (A. St. ¶43).[5]

As a result of its investigation, Global Security concluded that Gildenstern had violated Principle 10 (A. St. ¶45; G. Resp. ¶45). After Rakosnik told Ketterling of Global Security's conclusion and said that she recommended Gildenstern's termination, Ketterling decided to do just that (A. St. ¶¶47-49, G. Resp. ¶48). Ketterling and Heg met with Gildenstern for that purpose on November 7 (A. St. ¶50). Before that meeting Ketterling had never met Gildenstern and was not aware of Gildenstern's race or national origin (A. St. ¶51).

---

[5] Gildenstern mistakenly objects that Waukegan Safe and Lock's statement is inadmissible hearsay. Once again Abbott does not offer the statement for its truth, but rather to show that it honestly believed the proffered reason for Gildenstern's termination.

5

**Summary Judgment in the Title VII Context**

To defeat a summary judgment motion, a Title VII plaintiff[6] must establish[7] a genuine issue of material fact as to whether intentional discrimination motivated the employer's treatment. Two approaches are available to that end: (1) the direct approach, where plaintiff adduces direct evidence of the employer's discriminatory intent (not proffered in this case) or creates a "convincing mosaic of discrimination" out of pieces of circumstantial evidence (Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 2004))[8] and !2) the indirect approach, which employs the sequential burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Here the parties take the indirect approach, but this opinion will also assess whether the circumstantial evidence as a whole creates a

---

[6] Because the parties properly apply the same analysis to Gildenstern's race discrimination claim under both Title VII and Section 1981 (see Cerutti v. BASF Corp., 349 F.3d 1055, 1061 n.4 (7th Cir. 2003)), this opinion does not address the latter separately.

[7] At the summary judgment stage, of course, Gildenstern need not "show" or "establish" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion employs those terms only because the cited cases use that terminology, but it imposes on Gildenstern the lesser burden described earlier in this footnote.

[8] Such circumstantial evidence may include for example suspicious timing, ambiguously discriminatory statements, preferential behavior toward other employees, evidence that similarly situated non-protected employees were treated more favorably or evidence of pretext (Troupe, id. at 736-37).

"convincing mosaic of discrimination."

Under the McDonnell Douglas indirect-approach framework, Gildenstern must first set out a prima facia case of discrimination based on race or national origin (411 U.S. at 802). If he succeeds Abbott must proffer a legitimate nondiscriminatory reason for its conduct (id.). And if it does so, Gildenstern must adduce enough evidence for a reasonable jury to conclude that Abbott's asserted justification was merely a pretext for discrimination, with the adverse employment action actually being motivated by animus based on Gildenstern's race or national origin or both (id. at 804).

As stated earlier, Gildenstern claims he was subjected to disparate discipline. And that charge amounts to a reverse discrimination claim because he falls into the majority group in terms of both his race (Caucasian) and his national origin (United States).[9] To present a prima facie case of reverse discrimination, Gildenstern must show (1) that "background circumstances" suggest that Abbott discriminates against members of a majority group,[10] (2) that he was performing his job

---

[9] Our Court of Appeals has not yet addressed reverse discrimination based on national origin, but the parties assume that the "background circumstances" requirement applies in cases alleging discrimination based on the employee's origin in the United States. This Court agrees.

[10] By contrast, a member of a minority group fulfills the first element by showing his or her membership in a protected class (see, e.g., Wyninger v. New Venture Gear, Inc., 361 F.3d

7

reasonably according to Abbott's legitimate expectations, (3) that he suffered an adverse employment action and (4) that Abbott treated more favorably at least one similarly situated employee not of Gildenstern's race or national origin (see, e.g,. Henry v. Jones, 507 F.3d 558, 564-65 (7th Cir. 2007)).

Abbott argues that Gildenstern fails to set out a prima facie case of discrimination because he does not fulfill the first and fourth elements of the prima facie case. Abbott further contends that Gildenstern did not demonstrate that its asserted justification for the adverse employment action is pretextual. Abbott prevails on both of those grounds.

**1. Background Circumstances**

As to the first ground, Hague v. Thompson Distribution Co., 436 F.3d 816, 820 (2006)(internal quotation marks omitted) defines the "background circumstances" concept as one requiring the employee to "demonstrate that the particular employer has reason or inclination to discriminate invidiously against whites...or [to show] that there is something 'fishy' about the facts at hand."[11] On that score Gildenstern argues that a pay

---

965, 978 (7th Cir. 2004)).

[11] For example, our Court of Appeals has acknowledged the presence of such background circumstances where (1) an independent source confirmed that the employer considered race and gender in human resources decisions (Ballance v. City of Springfield, 424 F.3d 614, 618 (7th Cir. 2005)), (2) where a black supervisor replaced white employees with black employees (Hague, 426 F.3d at 822) and (3) where minority employees

8

disparity between himself and Rafael Rivera, a Puerto Rican Abbott employee, establishes the necessary background circumstances by showing a general practice of discrimination against Caucasian Americans (G. Mem. 6-7). But a comparison of the two does not bear out that contention.

True enough, their basic job difference duties--Rivera was an electrician, while Gildenstern was a carpenter--do not obscure the fact that both also performed scheduler/planner duties with Heg as their supervisor (G. St. ¶75). And Rivera was undisputedly paid at a higher salary grade (grade 8) than Gildenstern (grade 7) (G. St. ¶75). But a pay disparity between two workers is not enough to demonstrate problematic "background circumstances." Gildenstern has not offered evidence that shows a general practice of discrimination, given that (1) electricians such as Rivera normally received grade 8 pay and (2) two Caucasian American planner/schedulers received a higher salary grade than Gildenstern (A. St. ¶¶17, 20).

**2. Similarly Situated Employee**

For many years our Court of Appeals required any plaintiff pursuing the McDonnell Douglas formulation to identify a similarly situated comparator who "reported to the same supervisor, engaged in the same conduct, and had the same

---

dominated supervisory positions (Mills v. Health Care Serv. Corp., 171 F.3d 450, 457 (7th Cir. 1999)).

9

qualifications" and to "show that there were no differentiating or mitigating circumstances as would distinguish...the employer's treatment of them" (Ineichen v. Ameritech, 410 F.3d 956, 960-61 (7th Cir. 2005)(internal quotation marks omitted, but ellipsis in original)). More recently that degree of strict parallelism has been relaxed somewhat--as Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't, 510 F.3d 681, 687 (7th Cir. 2007) has reiterated, "[o]ur similarly situated requirement should not be applied mechanically or inflexibly"--but Gildenstern fails the comparator test however it is framed.

Here Gildenstern offers as a proposed comparator Jim Thomas ("Thomas"), a Mexican-American Abbott employee[12] who works in the carpenter shop on Abbott's North campus under Heg's supervision (A. St. ¶56; G. St. ¶99; A. Resp. ¶99). At issue is whether Thomas and Gildenstern "engaged in the same conduct."

First, Gildenstern says that Thomas took Abbott property in

---

[12] There is a good deal of amorphousness involved in categorizing individuals for purposes of such comparisons--something well illustrated by the parties' dispute as to Thomas' race and national origin. Thomas considers himself Caucasian and was born in the United States (A. St. ¶57; A. Resp. ¶99). Gildenstern responds that Thomas is Hispanic and of Mexican origin because his biological father is Mexican and because Thomas assertedly told other Abbott employees that he is Mexican (G. St. ¶¶57, 99, 101). Because "[t]he term 'national origin' refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came" (Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973)), Gildenstern will be viewed as having tendered enough evidence to raise a fact question at least as to Thomas' national origin.

10

violation of Principle 10 (the provision that triggered Gildenstern's termination) but that Abbott did not discipline him (G. St. ¶¶108, 110-11). Abbott retorts that Thomas had his supervisors' permission to take salvaged Abbott property (A. Resp. ¶¶108, 111). In an effort to counter that response, Gildenstern seeks to rely on his own statement and on statements of current Abbott employee Jerry Zalazink ("Zalaznik") and former Abbott employee Tony Steinke ("Steinke"), all of whom concluded that Thomas stole Abbott property on the basis of Thomas' purported out-of-court statements plus workplace rumors.[13]

At best the Gildenstern, Zalaznik and Steinke statements amount to inadmissible hearsay--not cognizable for summary judgment purposes under Rule 56(e)(1)--that suggests Thomas may have taken materials without permission (and even that proffered hearsay is thin gruel indeed). And most importantly, none of that stands as an effective counter to Abbott's representation

---

[13] Gildenstern says that Thomas bragged of taking Abbott materials (including materials to build a jungle gym and flag pole) and that he heard Thomas took an Abbott sawzall (a type of saw), but he admits that he does not know if Thomas had permission to take the items (G. St. ¶¶110-11; A. Resp. ¶¶110-11). Zalaznik says that he received an Abbott dust collector from Thomas (G. St. ¶112). Steinke says that Thomas bragged about taking an Abbott hinge, but he admits that he never saw Thomas steal anything (G. St. ¶110; A. Resp. ¶110). Gildenstern also asserts that Thomas told Steinke that hardware was "free for the taking" outside of one of Abbott's stockrooms, but the cited deposition testimony does not support that assertion at all--instead Steinke just describes the bins outside the stockroom in question (G. St. ¶110; A. St. ¶110).

11

that Thomas did have its permission--a critical and really dispositive negation of Thomas as an appropriate comparator to Gildenstern.

That critical distinction torpedoes Thomas' status as a "similarly situated employee." And it also obviates the need to explore in depth another possibility that could itself have destroyed the required parallelism and eliminated Thomas as a claimed comparator. For that purpose Abbott has provided evidence that its supervisors had no knowledge of other employees' beliefs that Thomas took Abbott property without permission (A. St. ¶¶70, 71; A. Resp. ¶109). But that evidence poses a factual issue, because Gildenstern has proffered statements that one or more employees did complain about Thomas to Heg and to supervisor Ed Shorman ("Shorman").[14] That Gildenstern-tendered input has some problems: He misreads the cited statements from Heg's deposition,[15] and because the complaint to Shorman occurred several years ago (in 2004) there could be "differentiating or mitigating circumstances" to

---

[14] Specifically, Steinke states that at his Abbott exit interview in 2004 he told Shorman that Thomas stole Abbott materials (although he did not give Shorman specific information about what items were stolen)(G. St. ¶109; A. Resp. ¶109).

[15] Gildenstern asserts that "Heg received complaints from other employees about Thomas taking their equipment" (G. St. ¶109), but Heg's deposition states only that employees complained that Thomas used or moved their tools in the workshop (A. Resp. ¶109).

12

distinguish Abbott's treatment of Gildenstern in 2008. But as stated at the beginning of this paragraph, this opinion is not required to follow that inquiry further, for the presence of permission as to Thomas and the absence of permission as to Gildenstern forecloses that aspect of the comparator analysis.

As a second line of attack in that regard, Gildenstern points out that Thomas engaged in other misconduct--including failure to meet work standards, insubordination, verbal and physical altercations, sleeping on the job, using computers for personal use and falsifying time cards--yet Abbott did not terminate him (G. St. ¶¶102-05). And for comparison purposes "same conduct" does not necessarily mean "identical"--it also encompasses conduct that is "similar" and of comparable seriousness (Ezell v. Potter, 400 F.3d 1041, 1050 (7th Cir. 2005)).

As to the bulk of those alleged offenses, Gildenstern again offers only inadmissible hearsay statements (G. St. ¶¶102-05). But Abbott admits Thomas failed to meet work standards, engaged in verbal altercations and used computers for personal use (which Abbott asserts is not prohibited)(A. Resp ¶¶102-104). Engaging in verbal altercations could perhaps be thought of as comparable in seriousness to misuse of company property, but even if it were the fact that Abbott required Thomas to attend anger management seminars provides "differentiating or mitigating circumstances"

13

(A. Resp. ¶103).

In summary, it is true that one possible avenue of the "similarly situated employee" inquiry could pose a disputed factual issue. But the other path--that based on permission or the absence of permission--assures victory for Abbott on that essential element of Gildenstern's required prima facie case.

Lest what has gone before be viewed mistakenly as involving some weighing of competing evidence and therefore as troubling in a summary judgment analysis, this opinion will go on to address Gildenstern's pretext arguments to assess fully whether the aggregate circumstantial evidence "compos[es] a convincing mosaic of discrimination" (Troupe, 20 F.3d at 737). As already stated, Abbott has tendered a non-discriminatory reason for its adverse employment action: It decided on termination because Global Security concluded that Gildenstern stole Abbott property (A. Mem. 6).

To show that reason is only pretextual, Gildenstern must demonstrate "(1) it is more likely that a discriminatory reason motivated [Abbott] than the proffered non-discriminatory reason or (2) that [Abbott's] reason is not credible" (Hudson v. Chicago Transit Auth., 375 F.3d 552, 561 (7th Cir. 2004)). As the ensuing discussion shows, none of Gildenstern's five arguments on that score survives analysis.

First, Gildenstern argues that he demonstrates pretext by

14

showing that Thomas was similarly situated, yet he was treated preferentially. That contention has been scotched by the earlier discussion on the subject--but even if that analysis had come out the other way, Gildenstern's arguable ability to establish an element of the prima facie case could not alone be enough to show pretext (else why the sequential analysis?).

Second, Gildenstern contends that Abbott's allegations against him were unfounded and that its investigation was faulty. Gildenstern maintains that he did not take the locks (G. St. ¶76), suggests alternative explanations for how the locks came to be installed at Nighbor's home,[16] offers speculation in an attempt to show those explanations are plausible[17] and argues that Abbott did not fully consider alternative explanations (G. Mem. 13).

Both of Gildenstern's sets of hypothetical possibilities-- those outlined in nn. 16 and 17--would, if they were being looked at solely as part of a basic Rule 56 evaluation, be credited to

---

[16] For that to be true, either (1) someone else obtained and repinned an Abbott lock or (2) the locks do not belong to Abbott, but someone else repinned the locks to fit the keys marked "Abbott" (G. Mem. 13).

[17] Gildenstern contends that any handyman could modify ("repin") a lock so that it could be used with an Abbott key, that other Abbott employees can repin a lock in this way, that other Abbott employees and outside contractors had access to Abbott locks, that Abbott does not maintain inventories of lost keys or locksets and that the type of locks in question are common and widely available (G. St. ¶¶84-90; A. Resp. ¶90).

15

the extent that they create reasonable inferences.  But it must be said that those speculative scenarios would frankly imperil the Rule's requirement that an issue of material fact must be "genuine."  And Gildenstern's counsel might be reminded that neither this Court nor any trier of fact would be obligated to believe in the tooth fairy.

But for present purposes--the examination of pretext vel non on the part of Abbott's decisionmaker--the critical (indeed, controlling) issue is how those "what if?" scenarios posed by Gildenstern would or would not have impacted on the decision to terminate him.  And to that end <u>Abbott</u> was clearly not required to draw strained inferences in his favor, let alone to believe in the tooth fairy either.

Remember that "[p]retext is more than a mistake on the part of the employer; it is a phony excuse" (<u>Hudson</u>, 375 F.3d at 561). It would not have mattered if the asserted reason had been "foolish or trivial or even baseless,[18] as long as [Abbott] honestly believed its reason" (<u>Gordon</u>, 246 F.3d at 889 (internal quotation marks omitted)).  Gildenstern offers no evidence that could suggest Abbott did not "honestly believe" its stated reason.[19]  And although an employee may establish pretext by

---

[18] [Footnote by this Court]  In this instance Abbott's stated reason was plainly none of those.

[19] It will be recalled that before meeting with Gildenstern to apprise him of the already-reached termination decision,

16

"provid[ing] a detailed refutation" of underlying events (id. at 889), Gildenstern offers not a detailed refutation but only hypothetical alternative "explanations."

Third, Gildenstern argues that Abbott tolerated employees' personal use of Abbott property and that (given the permissive workplace culture) "it is not credible for [Abbott] to claim that the true reason [Gildenstern's] employment was terminated was due to stealing or misuse of Abbott property" (G. Mem. 14). Gildenstern offers evidence suggesting that Abbott informally permitted employees to take discarded supplies and hardware home (perhaps even without a supervisor's permission) from Abbott's workshops (G. St. ¶¶90-91). But none of the employees involved in the investigation and termination decision--Munts, Meadie, Rakosnik and Ketterling--worked in the workshop, and there is no evidence that they knew of the assertedly tolerant workplace culture.

Fourth, Gildenstern contends that Abbott purposely assigns termination decisions to higher-ups like Ketterling (who, as already reiterated, did not personally know Gildenstern's race or national origin) to insulate itself from Title VII liability. If as here the decisionmaker "did not know of a plaintiff's membership in a protected class" (Rabinovitz v. Pena, 89 F.3d

---

Abbott's decisionmaker Ketterling had neither met Gildenstern nor known has race or national origin.

482, 488 (7th Cir. 1996)), an attempt to assert pretext on the decisionmaker's part may or may not face an insurmountable hurdle.[20] But in all events, here any such pretext argument is purely speculative, because Gildenstern offers no evidence at all that Abbott designed its human resources practices to prevent liability, or that relevant Abbott employees (Meadie, Munts, Rakosnik) exhibited discriminatory animus.

Fifth, Gildenstern argues that Abbott offered inconsistent descriptions of its basis for termination, telling Gildenstern that he was terminated for "irresponsible use of Abbott materials" but characterizing the violation as "theft" during the course of this litigation. It is true that a significantly "changed story" explaining an adverse employment action may evidence pretext (see, e.g., Zaccagnini v. Charles Levy Circulating Co., 338 F.3d 672, 676-77 (7th Cir. 2003); Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 291 (7th Cir. 1999)). But here the difference in labels is wholly semantic rather than substantive.

After all, Gildenstern acknowledges (as he must) that he was found in violation of Abbott's Principle 10, which covers "loss,

---

[20] Most recently--indeed, just ten days ago--Long v. Teachers' Retirement Sys., No. 08-3094, 2009 WL 3400955, at *6 (7th Cir. Oct. 23) confirmed the within-circuit conflict as to the applicability and scope of the "cat's paw doctrine," under which a plaintiff may be able to overcome that hurdle by showing discriminatory animus on the part of another employee who influenced the adverse employment action.

damage, carelessness, waste, misuse and theft" of Abbott property (A. St. ¶22; G. Resp. ¶47). Just because Abbott's people chose the less pejorative term for their in-person announcement that Gildenstern was fired, the current semantic shift in terms cannot reasonably be viewed as a "changed story" of sufficient significance--after all, both characterizations cover the same misconduct.

In sum, Gildenstern has not been able to demonstrate pretext based on any of his arguments. Nor have his efforts even approached the level of creating a "convincing mosaic of discrimination."

**Conclusion**

Gildenstern has utterly failed to fulfill the prima facie case, to demonstrate pretext or to show discrimination otherwise. There is no genuine issue of material fact, and Abbott is entitled to a judgment as a matter of law. Its motion for summary judgment is therefore granted, and this action is dismissed with prejudice.

_____
Milton I. Shadur
Senior United States District Judge

Date: November 2, 2009